## LYDIA B. BULLIS

### *v.*

## MARY B. PITMAN.

[Submitted November 6th, 1918.   Decided December 12th, 1918.]

1. An agreement between a widow and a daughter to divide the principal of the estate of a deceased equally, *held* fair, made without concealment or effort at overreaching, and will not be set aside at the suit of the widow, but will be specifically enforced as prayed by the daughter.

2. The will involved in this case created no trust, and an agreement to divide the estate equally between the widow and the daughter is valid.

On bill, &c.

Mr. *Clarence L. Cole,* for the complainant.

Mr. *Frank S. Katzenbach, Jr.,* for the defendant.

BACKES, V. C.

William Bullis bequeathed his estate to his widow and daughter in trust to collect the income and during their joint lives to divide it equally, and upon the death of either the principal to go to the survivor. The two were appointed executrices. They agreed to divide the principal of the estate equally. The widow now wants the agreement set aside and the daughter prays that it be specifically enforced. The estate is valued at approximately $73,000, and consists of first-class bonds and mortgages readily divisible. The grounds for impeaching the agreement, as alleged in the bill, are that—

"4. Complainant has never had any business experience, and at the time she signed said agreement she was in great mental distress over the death of her husband, which had occurred only a few days before, and she did not fully know or fully appreciate the purport of her act in signing said agreement. She was not advised as to its legal effect and neither sought nor had legal advice as to the character and legal effect of the instrument she was asked to sign. Said agreement was drawn by counsel for said Mary B. Pitman. Complainant did not read the agreement, nor was it read to her; if it was she did not hear it, she being somewhat deaf.

"5. Said agreement is contrary to the express terms of the will, and contrary to the wishes of the testator, and is not enforceable in law or in equity."

The circumstances surrounding the making of the agreement are few and are practically undisputed. Mr. Bullis, seventy-seven years of age, married the complainant, forty-one years of age, on September 29th, 1916. He had been a widower about a year and a half. By his former marriage he had one child, Mary B. Pitman, the defendant, who was then fifty-four years

old.   Five days after the marriage Mr. Bullis, nervous and excited, called upon Gardner H. Cain, his legal adviser for many years, and requested the preparation of his will, which was at once drawn and executed.   Three days later he suicided by drowning in Sanhican creek.   He left a note addressed to his wife, stating that he intended to commit the act, and alarmed, she took it to Mr. Cain, to whom her husband had told her to go if she needed help or advice.   Later in the day she gave him the will.   Mrs. Pitman took Mrs. Bullis to her home where she remained until the day after the funeral, which took place on October 10th.   On the day of the death Mrs. Bullis informed Mrs. Pitman of the contents of the will, and the latter expressed herself as dissatisfied and that she was going to have the estate divided if she could, stating that the arrangement of the will would be all right between a mother and daughter, but was not at all right between Mrs. Bullis and herself.   Mrs. Bullis consulted an uncle, David B. Barrett, with whom she had lived many years, and told him of what Mrs. Pitman had said.   Mr. Barrett advised her to do what Mrs. Pitman wanted, evidently meaning to submit to a division of the estate, because, as he said to her, if she did not, they would probably break the will and her share would be reduced to one-third.   After the funeral it was arranged to go to Mr. Cain's office the following morning.   Mrs. Bullis asked her uncle to accompany her, which he did.   At the meeting were Mrs. Bullis and her uncle, Mrs. Pitman, her husband and Mr. Frank S. Katzenbach, Jr., her counsel, and Mr. Cain.   After the will was read by Mr. Cain, and after Mr. Katzenbach made clear his position as attorney for Mrs. Pitman, he stated his client's objections to the will, because of her disinclination to be associated with Mrs. Bullis in the management of the estate (which Mrs. Bullis already knew), and spoke of the disadvantages, and of the advantage of a division into two equal parts, each of the parties to take absolutely one-half and to release the interest that the other had by way of remainder.   Mr. Barrett asked Mr. Cain whether such a course would be legal, and being assured that it would, Mrs. Bullis and Mrs. Pitman agreed to a division.   In the presence and hearing of all the

agreement was dictated to a stenographer, who reread her notes aloud, and after it was transcribed it was again read aloud by Mr. Katzenbach. Mrs. Bullis expressed herself as satisfied, as did Mrs. Pitman, and they signed it in duplicate, and Mrs. Bullis took away with her one of them. To effect the division the agreement provided that the will was to be probated and letters issued to the executrices, and this was done on November 21st, 1916.

This action was not begun until June, 1918, and by the bill, after setting forth that she and Mrs. Pitman entered into the agreement under their hands and seals, the complainant makes the bare allegations above quoted. No misrepresentations, undue pressure, or fraudulent conduct of any kind, on the part of the defendant, is charged. The case as made by the pleading rests exclusively upon the complainant's deficiencies, out of which, because of the alleged inequality of the contracting parties, it is sought to evolve some sort of "oppression" or moral delinquency, or constructive fraud on the part of the defendant, against which equity will give relief. And the case as made by the proofs is no stronger. Even the allegations that are made are not supported by the evidence. There can be no doubt that the agreement was read to or by the complainant, for she admits that she fully understood its terms and its effect upon the rights of the parties under the will and that at the time she was satisfied and so expressed herself. There was no "great mental distress" due to bereavement and not much, if any, was to be expected under the circumstances, for Cupid did not officiate alone at the nuptials. There certainly were no manifestations of grief by the widow, and for that matter none on the part of the daughter, so far as the evidence discloses. Both women were calm and self-possessed and calculating. They were intent solely upon making a financial adjustment, mutually satisfactory, if possible, in a trying and painful situation. There was no sympathy and nothing of the sentimental in their dealings. They dealt at arm's length.

Although the agreement followed closely upon the death of Mr. Bullis, the complainant was not taken by surprise. It was

not "sprung" on her as her counsel asserts. She had noticed from the time she first told Mrs. Pitman of the will that the relation created by it was objectionable, and that it would be severed promptly by a division of the estate, if that could be done. She was forewarned long before going to Mr. Cain's office of what was likely to happen there, and she knew that Mrs. Pitman, in her desire to rid herself of a distasteful association, was impersonal. Any other stepmother would have been just as objectionable. The proposition was squarely made and without the slightest reservation. There was no concealment or effort at overreaching. The cards were spread on the table. There was neither persuasion nor importuning to a hasty decision. The complainant was absolutely free to act, and after consulting with her uncle and being advised by him, she decided deliberately and voluntarily.

The bargain of an equal division was not unfair because of the disparity in ages of the contracting parties. Measured by the rule of expectancy of life the complainant will outlive the defendant and succeed to the estate, but this probability she doubtless had in mind and discounted the chance.

The bargain was not only fair, but it may be called generous when we reflect that but for the events of the week before her father's death the defendant would have come into the entire fortune, and when, further, we consider the suddenness of the complainant's windfall, and the possibility of being deprived of it, partly or wholly, upon issues of Mr. Bullis' testamentary capacity and his ability to contract marriage. These contingencies entered into the calculations of the widow and her uncle and influenced them profoundly, I have no doubt. Her position was not invulnerable and of this they entertained no false notions. There was no intimation by the defendant of a contest on this score, but the possibility of it was in the atmosphere and they naturally were apprehensive. Mrs. Bullis dreaded the notoriety of a judicial inquiry and fearful of the outcome, compromised understandingly. And then she waited until the time was up for contesting the will before repudiating the agreement, which is an added reason why she should not now be heard to complain.

There is no force in the argumentative statement of the fifth paragraph of the bill that the agreement is not enforceable in law or equity because it is contrary to the express terms of the will and contrary to the wishes of the testator. The argument is that the will creates a trust, which the executrices are bound, in conscience, to observe. The bequest is to the widow and daughter "in trust," but these inapt words do not create a trust. No person can be both trustee and *cestui que trust* at the same time. *Lew. Trusts 14; Perry Trusts § 13.* The possession and enjoyment of the property was in the two during their joint lives with remainder over to the survivor, and it-was theirs to do with as they pleased.

Counsel for the complainant also argues that if he has not made out a case of fraud sufficient to induce an annulment of the contract, at all events, a specific performance should not be decreed. To accede to this would leave the complainant as much the victor as if her prayer were sustained and the contract set aside. The agreement was fairly procured and its enforcement will work no injustice or hardship. "The remedy by specific performance is discretionary; the question is not what must the court do, but what, in view of all the circumstances of the case in judgment, should it do to further justice. When the contract has been fairly procured, and its enforcement will work no injustice or hardship, it is enforced almost as a matter of course; but if it has been procured by any sort of fraud or falsehood, or its enforcement will be attended with great hardship or manifest injustice, the court will refuse its aid." *Plummer* v. *Keppler, 26 N. J. Eq. 481.*

If counsel cannot agree upon a division of the assets, I will make it. If the values of any of the securities are questioned the matter will be referred to a master for investigation. Costs to the defendant.